**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**ENNISS FAMILY REALTY I, LLC**                                              **PLAINTIFF**

**VERSUS**                                              **CIVIL ACTION NO. 3:11cv739-KS-MTP**

**SCHNEIDER NATIONAL CARRIERS, INC.**                                     **DEFENDANT**

<u>**MEMORANDUM OPINION**</u>

This cause comes before the Court for ruling following a bench trial held on

February 14 and 15, 2013.  Upon due consideration of the testimony, exhibits, and

arguments presented at trial, as well as the parties' post-trial briefs, the Court is ready

to rule.

## I.  BACKGROUND

This lawsuit centers upon a dispute between the Plaintiff Enniss Family Realty I,

LLC ("Enniss"), the landlord under a commercial lease agreement, and the Defendant

Schneider National Carriers, Inc. ("Schneider"), the tenant under the agreement,

regarding the monthly rental amount due beginning in September of 2009.  The parties

do not dispute that a base monthly rental fee of $38,750.00 was required under the

terms of the lease agreement.  The rub lies in calculating adjustments to that base fee

pursuant to changes in the Consumer Price Index ("CPI").[1]

On November 7, 2011, Enniss filed a Complaint for Declaratory Judgment [1-1]

in the Chancery Court of Rankin County, Mississippi, concerning its dispute with

---

[1] The CPI is published by the United States Department of Labor (Bureau of Labor Statistics) and is designed to measure changes over time in prices paid by urban consumers for various goods and services.  *See* http://www.bls.gov/cpi/cpifaq.htm.

Schneider over rental payments.  On December 2, 2011, Schneider removed the proceeding to this Court on the basis of diversity of citizenship jurisdiction under Title 28 U.S.C. § 1332.  (*See* Notice of Removal [1].)  On February 1, 2012, Enniss filed its Second Amended Complaint for Declaratory Judgment [19], requesting a declaratory judgment as to the amount of all payments due to Enniss under the lease agreement and a monetary judgment in the amount of all past due payments.

On September 21, 2012, Enniss filed its Motion for Summary Judgment [44], asking that the Court find as a matter of law that the lease requires Schneider to pay $49,807.82 per month effective September 1, 2009; that the lease requires Schneider to pay a five percent (5%) monthly penalty on all outstanding rental payments; and that the lease requires Schneider to reimburse Enniss for its attorney's "fees generated in defense of the Lease Agreement."  (*See* Pl.'s Mem. of Law in Supp. of Mot. for SJ [45] at p. 7.)  On January 2, 2013, the Court entered its Memorandum Opinion and Order [66], which, *inter alia*, denied the Motion for Summary Judgment [44].  The Court found the relevant portions of the parties' agreement ambiguous, and thus, reserved for trial the determination of the amount due under the lease upon the consideration of parol or extrinsic evidence.  The Court further found that a summary judgment ruling enforcing the lease's interest penalty provision and attorney's fees reimbursement provision could not be made given the subject ambiguity and necessity of trial.

On February 14 and 15, 2013, a bench trial was held in this cause at the Federal Courthouse in Jackson, Mississippi.  At the conclusion of Enniss's case-in-chief, Schneider moved for judgment as a matter of law.  The Court granted the motion in part, finding the lease's interest penalty provision unenforceable because the interest

-2-

claimed constituted a significant penalty exceeding the principal purportedly owed, and because it appeared that Enniss failed to comply with certain conditions precedent to enforcement of the subject lease provision.[2]  At the conclusion of trial, the Court requested proposed findings of fact and conclusions of law from the parties.  Upon review of the evidence presented at trial and the parties' post-trial submissions, the Court renders the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a):

## II.  FINDINGS OF FACT

In 1999, Schneider, as tenant, entered into a Standard Commercial Lease Agreement (the "Lease" or "Agreement") [Plaintiff's Exhibit 1 ("P-1")] with Anika & Associates, Inc. ("Anika"), as landlord, for three (3) acres of land including seventeen thousand (17,000) square feet of industrial/warehouse space located at 301 East Metro Parkway, Brandon, Mississippi, 39042 (the "Subject Property").  The Lease was signed by representatives of Anika and Schneider in May of 1999 and had a "Commencement Date" of no later than July 26, 1999.  The Subject Property is adjacent to a General Motors distribution facility.  Schneider intended to utilize the Subject Property to provide certain delivery transportation services to General Motors.  The Lease had a term of 240 months, expiring in 2019.  However, Schneider had the option to terminate the

---

[2] Upon review of this ruling, it is apparent that Schneider and this Court erred in proceeding under Federal Rule of Civil Procedure 50(a) (Judgment as a Matter of Law) since Federal Rule of Civil Procedure 52(c) (Judgment on Partial Findings) applies in nonjury trials.  Nonetheless, this error was harmless since the Court would have reached the same result under Rule 52(c).  Moreover, as addressed below, the interest penalty provision is unenforceable because Enniss is not entitled to any rental payments beyond what Schneider has already paid.

Lease early (provided that it was not in default) in the event that its service contract with General Motors was not renewed.

The beginning rent was $11,758.33 for the first sixty (60) months of the Lease. CPI adjustments were to be made on the 61st, 121st and 180th months (2004, 2009, and 2014, respectively) following the Commencement Date.  The first CPI adjustment was made in or about September, 2004, and the rent was increased to $13,170.48. This adjustment occurred without issue.

On or about July 24, 2006, the Lease was amended to account for an expansion of the Subject Property.  (*See* 1st Amendment to Lease (P-2).)  The definition of the "Premises" in the Lease was changed to include a "Building" encompassing approximately fifty thousand (50,000) square feet and "Property" totaling approximately six (6) acres.  Also, the "Base Rent," as originally defined in the Lease exclusive of CPI adjustments, was changed to $38,750.00 per month effective November 1, 2006 or the later date that Schneider actually obtained possession of the Premises.  Beginning September 1, 2009, and running until August 31, 2019, the "Base Rent" was to be "$38,750.00 (plus CPI)".  The Amendment also foreclosed Schneider's option to terminate the Lease prior to January 1, 2011.  Further, Schneider and Anika ratified and adopted all of the remaining terms and conditions of the Lease.

On or about October 25, 2006, Schneider and Anika amended the Lease a second time.  (*See* 2nd Amendment to Lease (P-3).)  This Amendment extended the Lease term to March 31, 2027; changed "Base Rent" to $38,750.00 per month effective April 1, 2007 or the later date that Schneider actually obtained possession of the Premises; and set "Base Rent" between September 1, 2009 and March 31, 2027, at

"$38,750.00 (plus CPI)".  The parties again ratified and adopted all of the remaining terms and conditions of the Lease.  Steve Parent, Schneider's Director of Facilities in 2006 and corporate representative at the time of trial, signed both the 1st and 2nd Amendments on behalf of Schneider.

The expansion of the Subject Property, including the thirty-three thousand (33,000) square feet addition to the Building on the Premises, was completed in or about April of 2007.  Schneider began to occupy the expanded Premises, including the now fifty thousand (50,000) square feet Building, on or about April 24, 2007.

In May, 2007, Enniss purchased the Subject Property from Anika, and Anika assigned all rights and obligations under the Lease to Enniss.  (*See* Assignment and Assumption of Lease and Rent (P-4).)  Thus, Enniss became Schneider's landlord. Carolyn Sandoval, a member of Enniss and its Controller since 2002, testified at trial that Enniss was looking to purchase investment property with a rate of return or capitalization rate of 7 to 10 percent.  (*See* Trial Transcript "Tr." at pp. 24-25.)  Enniss paid approximately $5.2 million for the Subject Property, and the $38,750.00 rental amount allowed Enniss to realize its expected rate of return.  (*See* Tr. at pp. 117, 121-22.)

The Court finds by a preponderance of the evidence that either Anika or a representative of Anika drafted the Lease and its Amendments.  The testimony at trial established that neither Enniss nor Schneider drafted these instruments.  Thus, it is reasonable to infer that Anika, the only other contracting party, is responsible for preparing the Agreement.

From approximately June of 2007 through August of 2009, Enniss billed and

-5-

Schneider paid monthly rent in the amount of $38,750.00.[3]  (*See* Invoices (P-11); (P-13)

at Ennissdocs202-10.)  A CPI adjustment was scheduled to occur in September, 2009.

That is when the dispute between Enniss and Schneider arose.  Since the dispute turns

on calculating a CPI adjustment under the Lease, the Court sets forth below the

relevant Lease and Amendment terms:

**Lease (P-1)**

**II.  Base Rent**

     A.     Tenant agrees to pay to Landlord base rent for the Premises, in advance, without demand, deduction or set off, for the entire term hereof at the rate of Eleven Thousand Seven Hundred Fifty Eight and 33/100 Dollars ($11,758.33) per month, in advance, except that the rent due for the first month of the term shall be due on the date of execution of this Lease. Thereafter one such monthly installment shall be due and payable without demand on or before the first day of each calendar month succeeding the commencement date during the term hereof, except that the rental payment for any fractional calendar month at the commencement or end of the Lease period shall be prorated.

     B.     CPI Adjustment. The rent shall be adjusted commencing on the sixty-first month following the Commencement Date, on the One Hundred Twenty First month and on the One Hundred Eightieth month thereafter (the "Adjustment Date") by the percentage increase (if any) in the Consumer Price Index from the Commencement Date to each Adjustment Date, including any extension thereof. The base for computing the adjustment is the Consumer Price Index-All Urban Consumers, All Items ("CPI-U"), for the Southern Urban Area published by the United States Department of Labor, Bureau of Labor Statistic, in which 1982-84=100 (the "Index"), which is published for August, 1999 (the "Beginning Index"). If the Index published nearest the Adjustment Date ("Adjustment Index") has increased over the Beginning Index, the Rent specified in Paragraph II.A. shall be adjusted by subtracting the Beginning Index from the Adjustment Index, then dividing the difference by the Beginning Index, and multiplying the quotient of that calculation by the monthly Rent payable during the first

---

[3] This sum and other rental amounts referenced in this opinion exclude certain taxes and maintenance and insurance expenses paid by Schneider as "Operating Costs." (*See* Lease (P-1) at ¶ IV.)  Operating Costs are in addition to the "Base Rent" specified in the Lease and are not at issue in this lawsuit.

sixty months of the term of the Lease ($11,758.33 per month) (the "Beginning Rent") set forth in Paragraph II.A. The product of that multiplication shall then be added to the Beginning Rent, and the resulting sum shall be the monthly rent for the sixty month period following the applicable Adjustment Date. By way of illustration only, if the August 1999 figure for the Beginning Index is 120 and the August, 2004 figure is 125 (the first Adjustment Index), then the monthly rent for the ensuing sixty months would be increased by 4.17%, to a monthly rental of Twelve Thousand Two Hundred Forty Eight and 65/100 ($12,248.65) until the next adjustment on the One Hundred Twentieth month.

## 2nd Amendment (P-3)

2. **Base Rent.**  The Base Rent, as originally defined in Paragraph II(A) of the Lease Agreement, shall be adjusted to . . . ($38,750.00) per month.  The effective date of the Base Rent adjustment shall be April 1, 2007, provided that if Landlord can not deliver the possession of the Premises on April 1, 2007, the Base Rent adjustment date shall be the date when Tenant actually obtains possession of the Premises.

Therefore, the Base Rent, as defined in Paragraph II(A) of the Lease Agreement, shall be as follows:

Base Rent

| Date | Square Footage of the Premises | Triple Net Base Rent per Month | Total Triple Net (NNN) Base Rent Per Year |
|------|------|------|------|
| September 1, 1999 - August 31, 2004 | 17,000 | $11,758.33 | $141,099.96 |
| September 1, 2004 - October 31, 2006 | 17,000 | $13,170.50[4] | $158.046.00 |
| April 1, 2007 - August 31, 2009 | 50,000 | $38,750.00 | $465,000.00 |
| September 1, 2009 - March 31, 2007 | 50,000 | $38,750.00 (plus CPI) | $465,000.00 (plus CPI adjustments per Lease) |

On September 1, 2009, Enniss began billing $44,413.62 for rent.  (*See* Sept. and

---

[4] This figure was rounded up from the actual amount paid of $13,170.48.

Oct. 2009 Invoices (P-13) at Ennissdocs200-01.)  Enniss came to this figure by determining the dollar per square foot rental fee for the original 17,000 square feet Building space on the Subject Property, using that fee in the CPI adjustment formula specified under Paragraph II.B. of the Lease, and then multiplying the sum of that formula by the 50,000 square feet Building space existing on the Subject Property as of April, 2007.  On November 1, 2009, Enniss increased the amount billed to $49,145.22. (*See* Nov., Dec. and Jan. Invoices (P-13) at Ennissdocs198-99, 227.)  This amount was based on Enniss's amended position that the entire 50,000 square feet Building space should be used in calculating the CPI adjustment, and not just the original 17,000 square feet.  In accordance with this position, Enniss used the sum of $38,750.00 in the CPI adjustment formula in place of "Beginning Rent."  Apparently due to computational or typographical errors in calculating the rental fee of $49,145.22, Enniss increased the amount billed to $49,807.82 in February of 2010.  (*See* Feb. Invoice (P-13) at Ennissdocs226.)  Enniss billed the amount of $49,807.82 through the remainder of the Lease term and sent backdated invoices to Schneider to make up the difference between $49,807.82 and the amounts originally invoiced from September, 2009 through January, 2010.  (*See* Defendant's Exhibit 7 ("D-7").)

Enniss's initial CPI adjustment resulting in the amount of $44,413.62 was calculated by its Controller, Carolyn Sandoval, and communicated to a Schneider employee, Linda Vanderkam, by e-mail on August 20, 2009.  (*See* P-6 at Ennissdocs134-35.)  Ms. Sandoval testified at trial that she erred in calculating this figure by using the 1999 Base Rent amount as opposed to the Base Rent amount reflected in the 1st and 2nd Lease Amendments.  (*See* Tr. at p. 63.)  The $49,145.22

amount (which, without computational or typographical errors, should be $49,807.82) was calculated by Wade Enniss, a construction project manager for Enniss, and communicated to Schneider via a letter dated October 5, 2009.  (*See* D-12.)  Mr. Enniss, who is Ms. Sandoval's brother and a member of Enniss, testified that he became involved in the dispute and determined the correct monthly rent in the early part of October, 2009 when Ms. Sandoval came to him and indicated that there was a discrepancy in the Lease rate.  (*See* Tr. at pp. 188-89, 229.)

In November, 2009, Schneider increased its payments from $38,750.00 to $40,688.68.  (*See* Payment History (D-8) at SNC 90.)  Schneider's basis for this increase was that the 1999 Building space (17,000 square feet) was subject to a CPI adjustment in 2009 with a beginning CPI of August, 1999, while the 2007 space (33,000 square feet) would not undergo a CPI adjustment until 2012, and then with a beginning CPI index of April, 2007.  Wendy Sorensen, a real estate manager for Schneider, communicated this position to Enniss via a letter dated October 27, 2009.  (*See* D-14.)  Ms. Sorensen's letter provided that Enniss's CPI calculation, resulting in the monthly rent exceeding $49,000, was unreasonable since it required Schneider to "increase the total rent to include space that wasn't even built at that time."  The letter further provided that Schneider had calculated the rental amount of $40,688.68 in consultation with its legal department.

In or around April, 2010, Schneider increased its payments to $41,895.42.  This amount was based on Schneider's amended position that a CPI adjustment would be made for the entire property in 2009, with a beginning index of August 1999 for the 1999 space and an index of April 2007 for the 2007 space.  Steve Parent

communicated this position to Carolyn Sandoval via an e-mail dated March 16, 2010.
(*See* D-18.)  Mr. Parent's e-mail stated that Schneider had obtained an additional legal
opinion to the effect "that absent any explicit contrary wording in the 1999 Lease and
2007 Amendment and in accordance with the covenant of good faith and fair dealing
under Common Law, Landlord should not entitled [sic] to any CPI increase before April
1, 2007 with respect to 2007 New Space because Schneider never occupied such
space until April 1, 2007."  The e-mail also indicated that the basis for the difference
between Schneider's original and amended interpretations was "that 'good faith dealing'
suggests that we increase the amount paid on the new space (33,000 square feet) by
4.7% to reflect the change in CPI since we took occupancy."

Schneider subsequently issued back-payments to Enniss in order to make up the
difference between $41,895.42 and the monthly rents paid from September, 2009
through March, 2010.  Schneider effectively paid $41,895.42 per month in rent from
September, 2009 through the termination of the Lease.  The Lease terminated in
February of 2013 because Schneider lost its contract with General Motors.

Throughout the course of this litigation, Enniss has taken the position that
$49,807.82 is the correct monthly rental amount beginning in September, 2009.  Up
until the time of trial, Schneider took the position that $41,895.42 was the appropriate
amount.  For instance, in a November 1, 2012 motion filing, Schneider asserted "that
the correct amount is $41,895.42 per month."  (Doc. No. [59] at ¶ 2.)  Schneider
repeated this assertion in the Pretrial Order.  (Doc. No. [69] at ¶¶ 8(b), 9(b)(2)(g).)
However, Schneider's corporate representative, Steve Parent, took a different position
at trial.  Mr. Parent testified that the $40,688 sum reflected the true intent of the parties,

and that the $41,895 figure was a compromised position offered to get the dispute resolved.  (*See* Tr. at pp. 266-67.)  The parties' CPI calculations leading to these varying amounts are as follows:

<u>Enniss CPI Calculation</u>

1.     Adjustment CPI Index (2009) - Beginning CPI Index (1999) = Differential
       209.000 − 162.6 = 46.4
2.     Differential / Beginning CPI Index = Quotient
       46.4 / 162.6 = .285363
3.     Quotient x Beginning Rent = Product
       .285363 x $38,750 = $11,057.82
4.     Product + Beginning Rent = Adjusted Rent
       $11,057.82 + $38,750 = **$49,807.82**

<u>Schneider CPI Calculation (1)</u>

Adjusted Index (August 2009) – Beginning Index (August 1999) = Differential
209.000 − 162.6 = 46.4
Differential/Beginning Index = Quotient
46.4/162.6 = .285363
Quotient x beginning rent
.285363*0.69166647 = .197374 (increase)
Base rent + increase
0.69166647+0.197374 = .889040 per SF
.889040 x 17,000 = 15,113.68
Current rate of 0.775 x 33,000 = $25,575.00
       $15,113.68+$25,575.00 = **$40,688.68**

<u>Schneider CPI Calculation (2)</u>

<u>1999 space</u>
CPI increase in percentage =(209-162.6)/162.6=0.28536
Monthly rent increase: $11,758.33x0.28536=$3,355.36
The new monthly rent: $11,758.33+$3,355.36=$15,113.68

<u>2007 space</u>
CPI increase in percentage = (209-199.618)/199.618=0.047
Monthly rent increase: $25,579.50x0.047=$1,202.24
The new monthly rent: $25,579.50+$1,202.24=$26,781.74

<u>Total new monthly rent</u>:$15,113.68+$26,781.74=**$41,895.42**

The Court must now determine which of the preceding sums best reflects the intent of the parties under the Lease and its Amendments.

### III.  CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1332.  The substantive law of Mississippi applies to the contract interpretation issues presented in this action founded on diversity jurisdiction.  *See Exxon Corp. v. Crosby-Miss. Res., Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998).

Mississippi courts employ "a three-tiered approach to contract interpretation." *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 284 (¶ 13) (Miss. 2005) (citing *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 351-53 (Miss. 1990)).  "First, the 'four corners' test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement."  *Id.*  The court should "read the contract as a whole, so as to give effect to all of its clauses."  *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (¶ 10) (Miss. 2003) (citation omitted).  "When an instrument's substance is determined to be clear or unambiguous, the parties' intent must be effectuated."  *Pursue Energy Corp.*, 558 So. 2d at 352. Second, a court should look to "the discretionary canons of contract construction" if the parties' intent remains unclear or illusive after a reading of the instrument.  *Austin v. Carpenter*, 3 So. 3d 147, 150 (¶ 15) (Miss. Ct. App. 2009).  Third, "if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence."  *Royer Homes of Miss., Inc.*, 857 So. 2d at 753 (¶ 11).  The Mississippi Supreme Court does not require strict adherence to this step-by-step approach in all

-12-

circumstances.  *See Pursue Energy Corp.*, 558 So. 2d at 351 n.6 ("Indeed, overlapping

of steps is not inconceivable.").  "'The primary purpose of all contract construction

principles and methods is to determine the intent of the contracting parties.'" *Houston v.

Willis*, 24 So. 3d 412, 419 (¶ 24) (Miss. Ct. App. 2009) (quoting *Facilities, Inc. v.

Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 110 (¶ 6) (Miss. 2005)).

      The court may look beyond the four corners of the subject instrument in

determining the parties' intent upon a finding of ambiguity.  *See id.* at 419 (¶ 25).  A

contract should be considered ambiguous if "a careful reading of the instrument reveals

it to be less than clear, definite, explicit, harmonious in all its provisions, and free from

ambiguity throughout . . . ." *Barnett v. Getty Oil Co.*, 266 So. 2d 581, 586 (Miss. 1972).

Furthermore, "contractual provisions are ambiguous where they are susceptible of two

or more reasonable interpretations, or where one provision is in direct conflict with

another provision, or where terms are unclear or of doubtful meaning." *Reece v. State

Farm Fire & Cas. Co.*, 684 F. Supp. 140, 143 (N.D. Miss. 1987) (citing *Dennis v. Searle*,

457 So. 2d 941 (Miss. 1984)).  Ambiguity may also arise when contract terms are silent

as to certain issues arising between contracting parties.  *See Arledge v. Gulf Oil Corp.*,

571 F.2d 1388, 1391 (5th Cir. 1978) (citing Mississippi cases for the proposition that the

fact-finder may turn to extrinsic evidence to determine the parties' intent "[w]here a

written agreement is silent or ambiguous"); *Tubb v. Monroe County Elec. Power Ass'n*,

912 So. 2d 192, 197 (¶ 17) (Miss. Ct. App. 2005) (providing that an ambiguity exists

and the intentions of the parties must be determined where the grant of an easement is

silent as to its width); *but cf. Facilities, Inc.*, 908 So. 2d at 115 (¶ 19) ("[S]ilence alone

does not necessarily create an ambiguity as a matter of law.").

In ruling on Enniss's Motion for Summary Judgment [44], the Court found as

follows on the issue of whether the relevant provisions of the parties' Agreement are

ambiguous:

> It is clear to the Court that the "four corners" of the parties' Agreement require "$38,750.00 (plus CPI)" in rent starting in September, 2009. It is "less than clear" as to how CPI calculations are to be made starting in September, 2009. *Barnett*, 266 So. 2d at 586. First, substituting the amount of $38,750.00 for the "Beginning Rent" in Paragraph II.B. of the Lease, pursuant to Enniss's interpretation, is not supported by the express wording of the Lease and its Amendments. The 2nd Amendment changed "Base Rent," as originally defined in Paragraph II.A. of the Lease, to $38,750.00 effective April 1, 2007. Although Paragraph II.B. references the rent specified in Paragraph II.A., it does so pursuant to the following language: "the monthly Rent payable during the first sixty months of the term of the Lease ($11,758.33 per month) (the 'Beginning Rent') set forth in Paragraph II.A." The 2nd Amendment did not go back and change the amount of rent that Schneider paid during the "first sixty months" of the Lease, which was executed in 1999. This Amendment changed Base Rent **effective April 1, 2007**. Thus, the Amendment does not clearly and unambiguously require the amount of $38,750.00 to be substituted for the Beginning Rent amount of $11,758.33 in the Lease's CPI adjustment paragraph.
>
> Second, Enniss's interpretation results in "conflicting [Lease] clauses when the contract is read as a whole." *Dalton v. Cellular S., Inc.*, 20 So. 3d 1227, 1232 (¶ 10) (Miss. 2009). Several Lease provisions tie the payment of rent to Schneider's actual use or possession of the subject property. "[T]he rental payment for any fractional calendar month at the commencement or end of the Lease period shall be prorated." (Lease [38-1] at ¶ II.A.) "[A]ll of the Tenant's proportionate share of costs, expenses, and charges of any nature whatsoever relating to the Premises which may be attributable to or become due during the term, will be paid by Tenant . . . ." (Lease [38-1] at ¶ II.D.) "Tenant shall pay to Landlord, as additional rent during the term hereof, Tenant's proportionate share of Operating Costs . . . ." (Lease [38-1] at ¶ IV.A.) Even the 2nd Amendment to the Lease did not require Schneider to pay the increased Base Rent amount of $38,750.00 on April 1, 2007, "if Landlord can not deliver the possession of the Premises" by that time. (2nd Amendment to Lease [38-3] at ¶ 2.) Yet, under Enniss's present interpretation of the Lease, a portion of Schneider's rental fee (the 2009 – 1999 CPI adjustment) would be calculated on the basis of improved

property (33,000 additional square feet of Building space) that did not exist until 2007.  Payment for theoretical use of property conflicts with payment for actual use or for "Tenant's proportionate share".  (Lease [38-1] at ¶¶ II.D., IV.A.)

Third, each of the parties has posited more than one interpretation of the Lease CPI adjustment paragraph over the course of their dispute.  "[I]f contract language is susceptible of two or more reasonable interpretations, then ambiguity is present."  *Cain v. Cain*, 967 So. 2d 654, 662-63 (¶ 18) (Miss. Ct. App. 2007) (citation omitted).  Surely, the parties believed each of their various interpretations to be reasonable at the time they were made.  Only rigid formalism would require the Court to turn a blind eye to the parties' varying Lease interpretations in determining whether the Lease and its Amendments are ambiguous as to the amount of rent due in September of 2009.  The Court will lift the blindfold and recognize an ambiguity since contract interpretation under Mississippi law "is not a rigid step-by-step approach . . . and overlapping of . . . [the three-tiers of contract construction] is not prohibited."  *Crisler v. Crisler*, 963 So. 2d 1248,1252 (¶ 8) (Miss. Ct. App. 2007) (citing *West v. West*, 891 So. 2d 203 (¶ 15) (Miss. 2004)).  Moreover, "it is a question of law for the court to determine whether a contract is ambiguous."  *Abernathy*, 913 So. 2d at 283 (¶ 12).

(Mem. Op. & Order [66] at pp. 12-14.)

Nothing presented at trial leads to a different conclusion.  In fact, the trial testimony reinforces the appropriateness of the Court's ruling on the issue of contract ambiguity.  For instance, Enniss's Controller, Carolyn Sandoval, acknowledged that there was an inconsistency between the reference to "Beginning Rent" in the Lease's CPI adjustment paragraph and the references to "Base Rent" in the Lease Amendments.  (*See* Tr. at pp. 114-15.)  The existence of inconsistent contract provisions is a well recognized basis for ambiguity under Mississippi law.  *See, e.g.*, *Sanford v. Federated Guar. Ins. Co.*, 522 So. 2d 214, 216-17 (Miss. 1988)*; Houston*, 24 So. 3d at 419 (¶ 25); *Barber v. Balboa Life Ins. Co.*, 747 So. 2d 863, 871 (¶ 29) (Miss. Ct. App. 1999).  Schneider has changed positions as to the "correct" contract interpretation prior to trial *and* during the course of this litigation.  As noted above,

-15-

Schneider's position as late as the submission of the Pretrial Order [69] was that the interpretation resulting in a monthly rental amount of $41,895.42 was correct.  However, Schneider's corporate representative, Steve Parent, testified at trial that "40,688 is the proper number to be paid."  (Tr. at p. 282.)  Schneider's flip-flopping weighs against any finding that the pertinent portions of the Agreement are clear and unambiguous.  *Cf. Miss. Farm Bureau Mut. Ins. Co. v. Walters*, 908 So. 2d 765, 769 (¶ 11) (Miss. 2005) ("Ambiguity, in its simplest form, is the state of having multiple interpretations.").

Upon consideration of Enniss's request for summary judgment, the Court also found a fact issue presented as to the identity of the party that drafted the Lease and its Amendments.  Therefore, the Court was unable to "hold as a matter of law that the ambiguity in the interpretation of the Lease's CPI adjustment paragraph should be construed against Enniss or Schneider."  (Mem. Op. & Order [66] at p. 14.)  The Court, as the finder of fact, has now determined that Anika or a representative of Anika is responsible for preparing the Agreement.  Enniss, as the assignee under the Assignment and Assumption of Lease and Rent (P-4), stands in Anika's shoes with respect to the benefits and burdens of the Lease and its Amendments.  *See Ford v. White*, 495 So. 2d 494, 497 (Miss. 1986).  However, the Court opts not to construe the Agreement against Enniss pursuant to the familiar canon of construction that "ambiguities in the contract will be construed against the party who drafted it."  *Storey v. Williamson*, 101 So. 3d 662, 668 (¶ 24) (Miss. Ct. App. 2012) (citation omitted), *cert. denied*, 101 So. 3d 1171 (Miss. 2012).  "[E]mployment of the canons of construction is discretionary" and there is no indication that Schneider and Anika were of "unequal

bargaining power." *Refalt v. Refalt*, 94 So. 3d 1222, 1225 (¶ 11) (Miss. Ct. App. 2011), *cert. denied*, 96 So. 3d 732 (Miss. 2012).[5]

The Court now determines that Schneider's course of performance, industry standards pertaining to CPI adjustments, and Schneider's intent in using CPI adjustments in the Lease support the Agreement being interpreted to require a monthly rental amount of $41,895.42 starting in September, 2009.  "The rule is well settled that where a contract is ambiguous, the Court may look to the construction which the parties have placed upon it in order to ascertain its true meaning."  *Delta Wild Life & Forestry, Inc. v. Bear Kelso Plantation, Inc.*, 281 So. 2d 683, 686 (Miss. 1973).  The parties' performance is often the best evidence of what the contract requires of them.  *See Kight v. Sheppard Bldg. Supply, Inc.*, 537 So. 2d 1355, 1358 (Miss. 1989) (citing *Delta Wild Life & Forestry, Inc.*, 281 So. 2d at 686).  In accordance with this precedent, the Court finds Schneider's effective payment of $41,895.42 per month from September, 2009 through the termination of the Lease to constitute relevant extrinsic evidence of Schneider's payment obligations.

Schneider's initial payment of $40,688.68 per month does not control since Schneider subsequently issued back-payments in order to make up the difference between this sum and the higher amount of $41,895.42.  Contrary to Enniss's urging, Anika and Schneider's calculation of the 2004 CPI adjustment is not relevant here.  The

---

[5] Numerous authorities have refused to construe ambiguities against the drafting party where both contracting parties were commercially sophisticated and their agreement was the result of arm's-length negotiations.  *See, e.g.*, *Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 858-59 (7th Cir. 2002); *Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257, 1261 (5th Cir. 1976); *W. Sling & Cable Co. v. Hamilton*, 545 So. 2d 29, 31-32 (Ala. 1989).

2004 CPI adjustment occurred prior to the effective date of the Lease Amendments and the construction of the Lease and its Amendments as a whole is the central issue before the Court.  Enniss's effective billing of $49,807.82 per month since September, 2009 is also irrelevant in the course of performance analysis.  Anika was the Landlord upon the execution of the Agreement, and the testimony at trial[6] establishes that Enniss had no knowledge of the intentions of Anika or Schneider at the time of contracting.  *Cf. UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp., Inc.*, 525 So. 2d 746, 754 (Miss. 1987) (finding the course of performance rule of little benefit in determining whether the actions of a successor party constituted a material breach of contract).

Evidence submitted at trial regarding the standard industry purpose of utilizing a CPI adjustment in a commercial lease agreement squares with the parties' Agreement requiring a rental fee of $41,895.42 starting in September of 2009.  "Where the language of the contract is not helpful, extrinsic evidence may be considered, such as prevailing industry standards or commonly accepted trade usage."  *Harrison County Commercial Lot, LLC v. H. Gordon Myrick, Inc.*, 107 So. 3d 943, 959-60 (¶ 65) (Miss. 2013) (citing *Dalton*, 20 So. 3d at 1232 (¶ 10)); *see also 4-County Elec. Power Ass'n v. Tenn. Valley Auth.*, 930 F. Supp. 1132, 1141 (S.D. Miss. 1996) (providing that evidence of custom and usage in a particular industry may be considered if a contract is ambiguous or silent on a specific issue).

Both Schneider and Enniss are sophisticated commercial entities having experience with numerous lease agreements beyond the subject Lease.  Ms. Sandavol for Enniss agreed that the purpose of the CPI adjustment provision is to neutralize the

---

[6] (*See* Tr. at pp. 141-43, 223, 268.)

effect of inflation.  (*See* Tr. at p. 124.)  Wade Enniss testified that the function of CPI in commercial leases is to keep the value of the deal the same.  (*See* Tr. at p. 234.)  Mr. Parent for Schneider provided that CPI increases are utilized in order to maintain a fair deal between the landlord and tenant, taking into consideration the effect of inflation. (*See* Tr. at pp. 252, 330-31).  Expert witnesses for the parties provided similar testimony.[7]  Walter Michel was accepted as an expert for Enniss in the field of commercial real estate.  Mr. Michel provided that generally, CPI is meant to neutralize inflation and increase the owner's rate of return.  (*See* Tr. at p. 309.)  Steve Rogers was accepted as an expert for Schneider in the field of real estate investment.  Mr. Rogers testified that the utilization of a CPI provision is "a very common technique for a landlord and a tenant to adjust the rent upward to maintain and keep up with the rate of inflation."  (Tr. at pp. 358-59.)  Upon consideration of the totality of this testimony, the Court finds that the standard or customary purpose of including a CPI adjustment provision in a commercial lease agreement is to neutralize the effect of inflation on the landlord's rate of return.

---

[7] The Fifth Circuit has "recognized that a trial court's reliance on individuals experienced in a particular field for the purposes of obtaining explanation of the technical meaning of terms used in the industry is 'prudent.'"  *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (citing *Phillips Oil Co. v. OKC, Corp.*, 812 F.2d 265, 281 (5th Cir. 1987)); *see also Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*, No. 3:06cv714, 2011 WL 765555, at *6 (S.D. Miss. Feb. 25, 2011) (finding that experts could testify as to industry customs and practices in light of contract ambiguity); *Black Stone Acquisitions Partners I, L.P. v. Black*, No. 1:07CV9, 2008 WL 3335895, at *5 (N.D. Miss. Aug. 6, 2008) (same as to expert testimony regarding the technical definition of a contract term).  Moreover, in construing a particular contract term, a court "must give consideration to the meaning attributed to that term in the industry."  *Kona Tech. Corp.*, 225 F.3d at 611.

Enniss's CPI calculation results in an approximate 44% increase in rent per square foot from 1999 to 2009.  (*See* Tr. at pp. 135-36.)  By contrast, the rate of` inflation during this time period was approximately 28%.  (*See* Tr. at pp. 136, 296, 366.) Enniss's calculation also results in an approximate 28.5% percent increase in rent from 2007 to 2009, while inflation was only approximately 4.7% for that time period.  (*See* Tr. at pp. 366, 369-70.)  Clearly, Enniss's approach does more than just neutralize inflation; it significantly increases the rate of return, which is not the standard or customary purpose of a CPI adjustment in a commercial lease agreement.[8]  Enniss's approach also results in a ten (10) year inflationary adjustment (the 1999 – 2009 CPI adjustment) on improved property (33,000 square feet of Building space added in 2007) that only existed for approximately two (2) years.  Steve Rogers, Schneider's expert, testified that in his thirty (30) years of practice involving thousands of commercial leases he had never seen CPI applied for periods of time when property did not exist.  (*See* Tr. at pp. 359-60, 364-65.)  Steve Parent, Schneider's corporate representative, testified that he had never used a CPI index to advance rental rates beyond the actual inflation rate, and that Schneider did not use CPI indices to predate lease terms.  (*See* Tr. at p. 331.) Based on the foregoing, the Court finds that Enniss's CPI calculation, producing a monthly rental amount of $49,807.82, conflicts with "prevailing industry standards or

_____

[8] At trial, Enniss took the position that there would be no further CPI adjustments between 2014 and 2027 under the terms of the Lease, and thus, its rate of return would be reduced during that time period.  Schneider contends that the Lease requires separate CPI adjustments at sixty (60) month intervals through termination.  The Court need not resolve this hypothetical issue since the Lease terminated in February of 2013.

commonly accepted trade usage." *Harrison County Commercial Lot, LLC*, 107 So. 3d at 959-60 (¶ 65).

Schneider's method of utilizing a 1999-2009 CPI adjustment for the 17,000 square feet of Building space existing since 1999 (the 1999 Building space) and a 2007-2009 CPI adjustment for the 33,000 square feet of building space added in 2007 (the 2007 Building space) results in rental payments that largely track the rate of inflation. The rate of inflation for 1999-2009 was approximately 28%. There was an approximate 28.5% increase in the initial rent of $11,758.33 and subsequent rent of $15,113.68 for the 1999 Building space. The rate of inflation for 2007-2009 was approximately 4.7%. There was an approximate 4.7% increase in the initial rent of $25,579.50[9] and subsequent rent of $26,781.74 for the 2007 Building space. The total of $15,113.68 plus $26,781.74 is $41,895.42, the amount effectively paid by Schneider in monthly rent from September of 2009 through Lease termination. The Court thus finds that Schneider's CPI calculation resulting in the amount of $41,895.42 (the "$41,895.42 CPI"), serves the standard or customary purpose of neutralizing the effect of inflation on the landlord's rate of return.

Schneider's alternative CPI calculation resulting in the monthly rental amount of $40,688.68 (the "$40,688.68 CPI"), seems to similarly protect against inflation, albeit at different points in time. Under the $40,688.68 CPI, a 1999-2009 CPI adjustment for the 1999 Building space would take place in 2009, and a 2007-2012 CPI adjustment for the

---

[9] This figure is derived by subtracting $13,170.50 (the approximate Base Rent for the Premises during the Lease term immediately preceding the April of 2007 expansion) from $38,750.00 (the Base Rent for the Premises during the Lease term immediately following the expansion). (*See* 2nd Amendment (P-3) at p. 2.)

2007 Building space would occur in 2012.  Although neither of Schneider's approaches to CPI is expressly provided for under the terms of the parties' Agreement, which does not render either approach inoperative given the Court's ruling on contract ambiguity, the Court finds that the $41,895.42 CPI fits better with the terms of the Lease and its Amendments.  The $41,895.42 CPI corresponds with the Lease provision requiring CPI adjustments at approximate five (5) year intervals, on the 61st (2004), 121st (2009) and 180th (2014) months following the Commencement Date.  (*See* Lease (P-1) at ¶ II.B.) On the other hand, the $40,688.68 CPI leads to CPI adjustments being made at three (3) year intervals, in 2009 (for the 1999 Building Space), 2012 (for the 2007 Building Space based on Schneider commencing occupancy in 2007) and 2014 (again for the 1999 Building space).  Neither the 1st nor 2nd Amendment changed the Commencement Date of the Agreement.  Further, both Amendments ratified and adopted all of the remaining terms and conditions of the Agreement.  The Court also finds the $41,895.42 CPI to be appropriate since Schneider effectively paid rent pursuant to that approach, rendering the $40,688.68 CPI speculative and hypothetical in nature.  *See Kight*, 537 So. 2d at 1358.

Schneider's intent in using CPI adjustments in the Lease, as evidenced by the testimony of Steve Parent, also supports the $41,895.42 CPI.  *See Houston*, 24 So. 3d at 419 (¶ 24) ("The primary purpose of all contract construction principles and methods is to determine the intent of the contracting parties.").  Mr. Parent testified that "[t]he intention of the deal was . . . that there would be a periodic CPI index that would preserve, for lack of a better term, the position.  It would treat both the landlord and Schneider National fairly moving forward."  (Tr. at pp. 335-36.)  Schneider expected

-22-

Lease "payment[s] to increase consistent with inflation . . . ."  (Tr. at p. 350.)  The CPI

provision would "be applied in five-year increments."  (Tr. at p. 336.)  Schneider "would

not expect a CPI increase for any period prior to occupying a property."  (Tr. at p. 332.)

The $41,895.42 CPI corresponds with these intentions or expectations since it largely

tracks the rate of inflation and does not result in Schneider paying a ten (10) year CPI

adjustment for property (the 2007 Building space) that only existed for two (2) years as

of September, 2009.[10]

Confident in their respective contract interpretations (or perhaps wary of the

unknown), neither party called a representative of Anika to testify at trial regarding its

interpretation of the Agreement's CPI adjustment provisions.  The absence of such

testimony weighs more heavily against Enniss since it was not an original party to the

Agreement and since it lacked any knowledge of Schneider or Anika's intentions at the

time of contracting.  (*See* Tr. at pp. 23, 35, 141-43, 223, 268.)  Enniss's principal

---

[10] Mr. Parent also testified that the $41,895.42 amount represented a compromised position offered to settle Schneider's dispute with Enniss, while the $40,688.68 amount reflected the true intent of the parties.  (*See* Tr. at p. 267.)  Upon review of the totality of Mr. Parent's testimony and the correspondence exchanged between Enniss and Schneider early in their dispute, it appears that both of these figures were derived through consultation with legal counsel given the lack of clarity in the parties' Agreement as to how to calculate CPI adjustments following the execution of the Lease Amendments.  In other words, it is not evident to the Court that at the time of contracting Schneider intended to utilize a CPI adjustment formula that resulted in a monthly payment of $40,688.68, as opposed to $41,895.42.  If that was Schneider's intention, it failed to make this clear through the language of any operative document.  *Cf. WMS Indus., Inc. v. Fed. Ins. Co.*, No. 1:06CV977, 2009 WL 2408833, at *3 (S.D. Miss. Aug. 4, 2009) ("The court determines the parties' intent from the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties.") (citation and internal quotation marks omitted), *aff'd*, 384 Fed. Appx. 372 (5th Cir. 2010).  Schneider's effective performance under the $41,895.42 CPI and prior representations to this Court "that the correct amount is $41,895.42 per month", (Doc. No. [59] at ¶ 2; Doc. No. [69] at ¶¶ 8(b), 9(b)(2)(g)), further militate against any finding that $40,688.68 is the true and correct sum.

position at trial and on summary judgment was that the Agreement unambiguously requires a CPI adjustment in September of 2009 producing a rental amount of $49,807.82.  Having rejected that position, the Court concludes that the above-discussed parol or extrinsic evidence results in a monthly rent of $41,895.42.

## IV.  CONCLUSION

The Lease and its Amendments required monthly rental payments in the amount of $41,895.42 starting in September, 2009.  Schneider, as tenant, effectively paid Enniss, as landlord, this amount from September, 2009 through the termination of the Lease.  Thus, Enniss is not entitled to recover any additional rental payments from Schneider in this lawsuit.  The Lease's interest penalty and attorney's fees provisions are unenforceable absent a finding that Schneider has failed to meet its payment obligations under the Lease.  Since Schneider has met its payment obligations, these Lease provisions do not require Schneider to provide Enniss with interest payments or attorney's fees.  A separate judgment will be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure.

SO ADJUDGED this the 7th day of June, 2013.

s/Keith Starrett
UNITED STATES DISTRICT JUDGE